Filed 10/20/16  Certified for Publication 11/9/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN PEREZ, | |
| Plaintiff and Appellant, | G050718 |
| v. | (Super. Ct. No. 30-2009-00121208) |
| CITY OF WESTMINSTER et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Affirmed.

John J. Gulino for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Melanie M. Poturica and Jeffery E. Stockley for Defendants and Respondents.

\*          \*          \*

Brian Perez, an officer with the Westminster Police Department, was given notice of intent to terminate his employment, based on an alleged lack of honesty and cooperation in the investigation of a claim of police brutality. Perez appealed the decision to terminate his employment, and the chief of police concluded the allegations against Perez could not be sustained. Perez's employment was not terminated, but he was removed from the SWAT team and the honor guard, and although he remained a field training officer, he was not assigned any trainees. Perez sued for violation of his rights under the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) (the Act). The trial court found the removal of Perez from the SWAT team and the honor guard, and the failure to assign trainees to him as a field training officer did not violate the Act. Perez appeals, and we affirm. Substantial evidence amply supported the trial court's decision.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

The facts underlying this case were set forth in a previous, unpublished opinion (*Perez v. City of Westminster* (Mar. 8, 2011, G042965), which we quote here:

"On November 18, 2007, Perez, along with other City [(City of Westminster)] police officers, responded to a disorderly conduct call outside a Westminster bar. Perez observed a suspect being detained. The suspect later complained a police officer (not Perez) struck him in the face.

"Perez was interviewed by [Cliff] Williams and [Mark] Groh [(supervisory and/or management employees of the police department)] on November 25, 2007, as part of the investigation of the excessive force complaint. Perez was not represented by counsel at this interview, and was not given any warnings under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) or *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822

2

(*Lybarger*). Perez advised Williams and Groh that he had not observed anyone striking the suspect or using excessive force. Perez was then told a videotape of the incident existed, which showed the suspect being struck by one of the officers, and also showed Perez had been close to the incident. Perez was admonished to be 'careful' how he answered the questions, and was told 'we gotta ask you a pointed question in here . . . Don't think I'm doubting your integrity—but I've got to be specific with what we're asking you on it . . . and the reaso[n] we're trying to pin you down on that, Brian, to be perfectly honest with you, is your description of what you saw officer Stouffer do was inconsistent with several other witnesses and the tape.'

"Perez was again interviewed on December 10, 2007. At the second interview, he had an attorney present, and was given the *Miranda* and *Lybarger* warnings. In responding to the questions of the investigating officers, Perez again stated he had not seen any act of excessive force used on the suspect, but that did not mean the act had not occurred.

"On January 29, 2008, Perez received a notice of intent to terminate his employment, reading, in part: 'Though you were not the subject officer in the administrative investigation your comp[l]ete and honest cooperation was required. Your version of the November 18th arrest of Dr. Rubin is inconsistent with the other officers present and the multiple video recordings of the parking lot where the arrest took place[;] it is apparent you were in a position to witness the incident involving Dr. Rubin and Officers Stouffer, Reyes, and Lumba.'

"Perez appealed the decision to terminate his employment. On March 12, 2008, Chief of Police Hall sent a letter to Perez's attorney, reading, in relevant part: 'After careful consideration of information provided by you and Officer Perez . . . , along with detailed review of the investigation report and video images, I have concluded there is insufficient evidence to sustain findings that Officer Perez violated Westminster Police Department Policy and Procedure by knowingly making false or misleading statements

3

during an internal affairs investigation and failing to report improper activities by other police personnel. Accordingly, the disposition of this matter will be one of "Not Sustained." [¶] This finding should not be misunderstood by Officer Perez as exoneration or one of innocence. It is strictly my conclusion the department has failed to meet the evidentiary burden necessary to sustain a finding of severe misconduct.'

"Although Perez was returned to his employment, he was excluded from the honor guard and the SWAT team, on the ground the internal affairs investigation was causing him 'obvious stress and upset and therefore it was not in [his] best interest to continue on these assignments and programs.' [Andrew E.] Hall told Perez's attorney that Perez did not have a promising career with the City's police department because he was perceived as someone who would not cooperate. After the investigation, Perez was never assigned to duty as a field training officer.

"On March 20, 2008, Perez filed a written claim with the City pursuant to Government Code section 945.4. The City did not respond. Perez filed a complaint on April 8, 2009."

The trial of this case was bifurcated, and heard by the court. In the first phase of the trial, the court found that Perez's rights under the Act were violated during the November 25, 2007 interview. The court also found that the decision to remove Perez from his SWAT team and honor guard assignments, and the decision to not assign any trainees to him, did not violate the Act.

During the second phase of the trial, the court found no evidence that the violation of Perez's rights under the Act during the November 25, 2007 interview was malicious or done with the intent to injure Perez. The court therefore denied Perez any monetary relief. The court did, however, find that injunctive relief, in the form of training to be provided to all Westminster Police Department supervisors regarding the appropriate procedures for interrogation of officers under the Act, should be granted. The court then entered a judgment of dismissal.

4

The issue presented by Perez is whether the trial court erred in finding that the City of Westminster neither violated the Act nor denied Perez's right to due process by removing him from his SWAT team and honor guard assignments, and by refusing to assign trainees to him. We review the trial court's decision under the substantial evidence rule. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Government Code section 3303 provides procedural safeguards to public safety officers who are subjected to interrogation that could lead to punitive actions: "When any public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action, the interrogation shall be conducted under the following conditions. For the purpose of this chapter, punitive action means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment."

Government Code section 3304 prohibits punitive action against a public safety officer for exercising his or her rights under the Act, and requires that an administrative appeal be permitted when punitive action is taken: "(a) No public safety

5

officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter, or the exercise of any rights under any existing administrative grievance procedure. [¶] . . . [¶] (b) No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency against any public safety officer who has successfully completed the probationary period that may be required by his or her employing agency without providing the public safety officer with an opportunity for administrative appeal." (Gov. Code, § 3304, subds. (a), (b).)

A violation of the Act may be challenged in the trial court. The court may grant injunctive or other extraordinary relief if it determines a violation of the Act has occurred. (Gov. Code, § 3309.5, subd. (d)(1).) The court may also award civil penalties if it finds that the public safety department or its employees violated the Act maliciously and with the intent to injure the public safety officer. (*Id.*, § 3309.5, subd. (e).) Further, a violation of the Act may entitle a public safety officer to administrative relief if he or she has suffered an adverse employment decision. (*Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822, 829-830 (*Lybarger*).)

The trial court found it to be undisputed that at Perez's interview on November 25, 2007, the City of Westminster failed to provide Perez with a *Lybarger* advisement,[1] a *Miranda v. Arizona* (1966) 384 U.S. 436 advisement, or an advisement that he had the right to be represented by counsel at the interview. The trial court further found that the November 25 interview was not a routine investigation within the normal

---

[1] In *Lybarger*, *supra*, 40 Cal.3d at page 825, the California Supreme Court annulled an administrative decision disciplining a police officer for failing to cooperate in an investigation into possible criminal misconduct. The court concluded that although the officer did not have an absolute right to refuse to answer potentially incriminating questions posed by his employer (*id.* at p. 827), the failure to advise the officer that his silence could be deemed insubordination, and that his statements could not be used against him in a criminal proceeding, violated Government Code section 3303, former subdivision (g) (*Lybarger*, *supra*, at pp. 829-830).

course of Perez's duties; a routine investigation would not be subject to the protections of Government Code section 3303. These findings were supported by the results of the interviews already conducted regarding the incident; the 50/50 chance that Perez's responses during the interview could subject him to punitive action; and the fact Perez's interviewers complied with some, but not all, of the requirements of section 3303. None of the parties challenges these findings.

The trial court next found that, before his December 10, 2007 interview, Perez was provided with all the necessary advisements under the Act. The minute order states: "It appears that [Perez]'s counsel correctly no longer contends that there was error here." Perez does not challenge this finding on appeal.

The trial court's final finding is the one that is at issue in this case. "[Perez] contends that his . . . rights [under the Act] were infringed in this process of termination, reinstatement, and removal of collateral duties. He argues that he was disciplined in violation of Government Code sections 3304(a) and 3304(b). There is no evidence to support this claim. The *Skelly* [(*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194)] process is largely irrelevant here, as it is not a right guaranteed by [the Act]. Furthermore, no adverse or retaliatory action was taken against Perez because of his exercise of his *Skelly* rights. Certainly, [Perez] cannot consider his reinstatement, which was the direct result of the *Skelly* hearing, to be adverse action. Nor was the reduction of collateral assignments a . . . violation [of the Act] or a retaliatory act taken because of the assertion of *Skelly* rights. Chief Hall testified that he removed those assignments because he 'had lost a great deal of confidence in the plaintiff.' There is no contrary direct or indirect evidence in this record."

Perez was not subject to any punitive action, as that term is defined by statute. "For the purpose of this chapter, punitive action means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (Gov. Code, § 3303.) Although Perez was initially threatened

7

with termination of his employment, that action was rescinded by the chief of police. The punitive actions alleged by Perez were his removal from the SWAT team and honor guard, and the refusal to place a trainee with him as a field training officer.

The SWAT team and honor guard were collateral assignments, not formal, full-time assignments. Removal from those collateral assignments was not considered discipline, but was part of the chief of police's "normal management of the department." The memorandum of understanding between the City of Westminster and the police bargaining unit provides that the nonassignment of a trainee to a field training officer is not a disciplinary or punitive action. The removal of Perez's collateral duties did not result in a reduction of salary, which is normally required to establish a punitive action. The loss of prestige or the loss of the ability to earn overtime pay is not sufficient. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845 [officer did not violate any departmental policy, but supervisor concluded his continued presence "was not conducive to a cooperative, productive working relationship"; officer's reassignment without loss of pay or rank was not punitive action, despite officer's "assertion that his work as a detective is less heroic than his job as a pilot"]; *Orange County Employees Assn. v. County of Orange* (1988) 205 Cal.App.3d 1289, 1293 [trial court's finding that transfer of facility director without "any financial loss—no reduction in pay or decrease in benefits" was not punitive was supported by substantial evidence].)

Indeed, two months after the decision was made not to terminate Perez's employment, he received a scheduled pay raise, although the chief of police could have taken action to stop the pay increase.

Perez does not cite any case in which the loss of additional, overtime pay was recognized as a punitive action under the Act. The cases cited by Perez involved the loss or decrease in the peace officer's salary. (*Baggett v. Gates* (1982) 32 Cal.3d 128 [peace officer reassigned to a lower paying position]; *White v. County of Sacramento* (1982) 31 Cal.3d 676 [transfer to a lower paying position]; *Orange County Employees*

8

*Assn. v. County of Orange*, *supra*, 205 Cal.App.3d at p. 1294 ["transfer unaccompanied by other actions adverse to the officer" is not punitive]; *McManigal v. City of Seal Beach* (1985) 166 Cal.App.3d 975 [reassignment resulted in a loss of pay]; *Doyle v. City of Chino* (1981) 117 Cal.App.3d 673 [police chief's pay was cut and he was later dismissed].)

The chief of police testified that he had authorized Perez's removal from the SWAT team, not as punishment, but because he had lost confidence in Perez's honesty and ability to work cooperatively with others.

"Q  Do you know why Officer Perez was removed from SWAT?

"A  I had lost my confidence in Officer Perez a great deal because of the events.  And even though I hadn't sustained the misconduct allegations in the internal affairs investigation, I had lost confidence, a great deal of confidence, in Officer Perez. [¶] . . . [¶]

"Q  So let me ask you this:  would you agree that removing Officer Perez from the SWAT team was a negative employment act?  [¶] . . . [¶]

"The witness:  I think any movement of an officer can be perceived by the officer as negative, if it is something they don't want to do.  [¶] But it wasn't done punitively, it wasn't done as punishment.  But I can perceive—but I would understand why an officer would say that any movement that they didn't want was a negative thing.

"  . . . [¶] Q  Well, I mean, in fact, it was punitive, wasn't it?  You removed him because you had lost confidence in him, you didn't want him to be a SWAT member any longer?  [¶] . . . [¶]

"The witness:  In my mind, there is a philosophical distinction.  He wasn't being punished for misconduct; he was being removed from a closely knit team where there was to be a high level of trust, that works in, you know, very precarious circumstances.  I think there is a different level there.

9

" . . . [¶] Q  Did you learn from any members of the SWAT team at the time that they didn't have trust in Officer Perez?

"A  I didn't interview any of the SWAT team members, no.  [¶] But the recommendation of discipline had come from two sergeants, one lieutenant and one captain, the recommendation, the belief that he had been dishonest and the recommendation that he be terminated.  So there was a lot to be overcome."

Similarly, the chief of police authorized Perez's removal from the honor guard, stating, "because I lost confidence in him, and I thought there was compelling information he hadn't been truthful in the initial investigation.  [¶] And the honor guard is an important ceremonial duty.  It bestows honor.  And I didn't think it was an appropriate place to have him, at that moment."

The chief of police testified he had not removed Perez from the honor guard or the SWAT team or as a field training officer because he had exercised his rights under the Act.

The notification that the intent to terminate Perez's employment was not sustained was placed in his personnel file.  The chief of police's letter to Perez's attorney that "[t]his finding should not be misunderstood by Officer Perez as exoneration or one of innocence.  It is strictly my conclusion the department has failed to meet the evidentiary burden necessary to sustain a finding of severe misconduct" was not placed in Perez's personnel file.  Indications that Perez had been removed from the SWAT team and honor guard would not be maintained in his personnel file.

Under the memorandum of understanding between the City of Westminster and the police bargaining unit, Perez had the opportunity to file a grievance regarding his removal from the SWAT team and honor guard, but had never done so.

The evidence supporting the trial court's finding was more than substantial.

10

DISPOSITION

The judgment is affirmed.  Respondents to recover costs on appeal.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

11

Filed 11/09/2016

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN PEREZ,<br><br>　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>CITY OF WESTMINSTER et al.,<br><br>　　Defendants and Respondents. | G050718<br><br>(Super. Ct. No. 30-2009-00121208)<br><br>ORDER GRANTING REQUEST<br>FOR PUBLICATION |

Respondent City of Westminster has requested that our opinion, filed on October 20, 2016, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(2) and (6). The request is GRANTED. The opinion is ordered published in the Official Reports.

FYBEL, J.

WE CONCUR:

ARONSON, ACTING P. J.

IKOLA, J.