[No. A067380. First Dist., Div. One. Jan. 31, 1996.]

EUGENE SATRAP, Plaintiff and Appellant, v.
PACIFIC GAS AND ELECTRIC COMPANY et al., Defendants and
Respondents.

**COUNSEL**

Chris A. Schaefer, Robert A. Jones and Richard M. Pearl for Plaintiff and Appellant.

Bruce R. Worthington, J. Michael Reidenbach, Deborah S. Shefler, Maureen L. Fries, Becherer, Beers, Murphy, Kannett & Schweitzer and Timothy J. Murphy for Defendants and Respondents.

## OPINION

**STEIN, J.**—Eugene Satrap appeals an order denying his motion, pursuant to Code of Civil Procedure section 1021.5, for attorney fees incurred in litigating his complaint for, inter alia, breach of contract, invasion of privacy and wrongful termination in violation of public policy against his former employer Pacific Gas and Electric Company (hereinafter PG&E).

### FACTS

Appellant was hired by PG&E in 1962, and was ultimately promoted to the position of manager of gas supply. In April of 1989, PG&E's corporate security department received a complaint of conflicts of interest, misuse of time and kickbacks in the PG&E gas supply department. In August of 1989, appellant received a letter informing him that the investigation had given PG&E "reasonable cause to believe that you have engaged in serious misconduct . . . . The allegations involve misuse of Company resources for personal purposes and conflicts of interest in the course of your duties as Manager." Appellant was placed on administrative leave pending further investigation. One week later an industry newspaper, apparently relying on the statement of a PG&E employee, incorrectly reported that appellant was being investigated for accepting kickbacks in connection with certain contracts. The California Public Utilities Commission (hereinafter Utilities Commission) became interested and asked PG&E to provide it with certain documents concerning the investigation of appellant, and information concerning PG&E's Canadian gas purchases. While still on administrative leave, appellant volunteered to cooperate with the Utilities Commission's investigation of PG&E's gas purchasing. Before appellant met with the investigators, PG&E instructed him not to discuss the contents of an interim report on its internal investigation of appellant. That report discussed, among other things, concerns appellant had expressed over a domestic contract negotiation he had participated in that he believed involved some improper political influences, and his suspicion that PG&E had been overpaying its Canadian gas suppliers. Appellant nevertheless met with the Utilities Commission's representatives and discussed some of these issues. He was allowed to return to work but was demoted. Meanwhile, he was required to continue to cooperate with an internal audit even though he demanded, to no avail, that PG&E have either the Utilities Commission or another independent third party conduct the audit. Eventually, appellant quit under circumstances that were found by a jury to constitute constructive termination.

Appellant's original complaint included causes of action for wrongful termination in violation of public policy and retaliation in violation of Labor

Code section 1102.5, commonly known as the "whistleblower" statute, based on allegations that PG&E interfered with and retaliated against appellant for disclosing, or planning to disclose, to the Utilities Commission information concerning what he believed to be violations of the law by PG&E. He also alleged a cause of action for invasion of privacy based on the public disclosure that he was being investigated for accepting "kickbacks." In addition, the complaint alleged causes of action for breach of contract, discrimination in violation of the Fair Employment and Housing Act, and interference with prospective economic advantage, based on PG&E's refusal to do business with appellant's new employer. Several causes of action were voluntarily dismissed, and the court granted PG&E's motion for nonsuit on several others. The case ultimately went to trial on the causes of action for breach of contract, wrongful termination in violation of public policy and invasion of privacy. The jury rendered its verdict in appellant's favor, awarding him economic damages of $48,750, noneconomic damages of $225,000, and punitive damages of $250,000. The jury specifically found that appellant had been terminated without cause, and in retaliation for his disclosures to the Utilities Commission. The jury also found that the public disclosures that appellant was being investigated for accepting kickbacks were false.

Shortly before the jury rendered its verdict, the Utilities Commission issued its decision on PG&E's application for an order finding that its gas and electric operations for the period of January 1, 1990, through December 31, 1990, were prudent. Their decision disallowed recovery of $90,133,000 from utility ratepayers that it found PG&E "could have saved had it pursued prudent alternative actions in procuring Canadian gas supplies."

Appellant filed a motion seeking an award of approximately $1.2 million in attorney fees pursuant to California Code of Civil Procedure section 1021.5. The court denied the motion, and appellant appeals.

ANALYSIS

Code of Civil Procedure section 1021.5 confers discretion on a trial court to award legal fees to a successful party in any action "which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not, in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5; see also *Woodland Hills*

*Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200].) ■ The purpose of an award of attorney fees pursuant to section 1021.5, is to encourage suits that enforce "common interests of significant societal importance, but which do not involve any individual's financial interest to the extent necessary to encourage private litigation to enforce the right. [Citation.] To encourage such suits, attorneys fees are awarded when a significant public benefit is conferred through litigation *pursued by one whose personal stake is insufficient to otherwise encourage the action. [Citation.] Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest."* (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 114 [212 Cal.Rptr. 485], italics added.) The decision whether the above listed factors warrant a fee-shifting award is directed to the discretion of the trial court, and will not be overturned on appeal absent a showing of abuse of that discretion. (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365]; *Feminist Women's Health Center* v. *Blythe* (1995) 32 Cal.App.4th 1641, 1666 [39 Cal.Rptr.2d 189].) " 'The pertinent question is whether the grounds given for its [order] . . . are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute.' " (*Feminist Women's Health Center* v. *Blythe, supra,* 32 Cal.App.4th at pp. 1666-1667.) The trial court found that appellant had failed to establish that the "necessity and financial burden of private enforcement of an 'important right affecting the public interest' justifies an award of attorneys fees in this case." The court found that appellant's "sole motivation from the beginning of this lawsuit through this motion, was, and is, his personal stake in the lawsuit and his personal financial gain."

■ Appellant first asserts that the court applied an erroneous legal standard that focused solely upon the subjective motivation of appellant, and that we should therefore review the order de novo. (See, e.g., *Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801-815 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].) We agree that appellant's subjective motivation for bringing the lawsuit is not a controlling factor in determining whether a Code of Civil Procedure section 1021.5 fee award is appropriate. Read as a whole, however, the trial court's order correctly states the legal standard it is to apply in determining whether to award attorney fees pursuant to section 1021.5. We, therefore, construe the reference to appellant's "motivation" as a shorthand reference to the court's conclusion that the objective financial incentives for prosecuting the lawsuit were not disproportionate to the financial burden. (See Code Civ. Proc., § 1021.5.)

It is within the trial court's discretion to deny attorney fees pursuant to Code of Civil Procedure section 1021.5 on the ground that the plaintiff's personal stake in the outcome was not disproportionate to the burden of private enforcement, even where the litigation enforced an important right and conferred a significant benefit upon the public. For example, in *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 30-31 [267 Cal.Rptr. 618], the court upheld an order denying a request for approximately $300,000 in attorney fees. The trial court had found that the wrongful termination suit alleging, inter alia, that the plaintiff had a constitutional right to refuse drug testing enforced an important public right and conferred a significant benefit. (*Id.* at p. 30.) Nevertheless, the court denied her request for attorney fees because it found the plaintiff had a sufficient financial incentive to bring the lawsuit based, in part, upon the fact that she sought and obtained a damage award of approximately $500,000. Similarly, in *Beach Colony II* v. *California Coastal Com.*, *supra*, 166 Cal.App.3d 106, the court found that Colony II, a development company, had vindicated important public rights in its challenge to certain conditions placed on its proposed development, yet found that Colony II had a substantial financial stake in the outcome because its "victory apparently makes it commercially feasible to build . . . 10 units and save $300,000 in offsite improvement expenses." (*Id.* at p. 114.) The court concluded that the "the public benefit . . . was wholly coincidental to Colony II's profit-making goals." (*Ibid.*; see also, i.e., *Wang* v. *Division of Labor Standards Enforcement* (1990) 219 Cal.App.3d 1152, 1161-1162 [268 Cal.Rptr. 669] [litigant had sufficient personal financial incentive to pursue litigation where he succeeded in challenging a $9,700 civil sanction, and also avoided exposure to further disciplinary action by Contractors' State License Board]; *California Licensed Foresters Assn.* v. *State Bd. of Forestry* (1994) 30 Cal.App.4th 562 [35 Cal.Rptr.2d 396] [court denied section 1021.5 attorney fees request because the regulations at issue significantly impacted the operation of appellant's business, thereby giving them a sufficient incentive to litigate]; *Planned Parenthood* v. *City of Santa Maria* (1993) 16 Cal.App.4th 685, 691-692 [20 Cal.Rptr.2d 391] [damages of $60,000 was sufficient financial incentive for litigation challenging permit limiting on-site performance of abortions, and fees denied despite enforcement of public right of access].)

In this case, the record supports the trial court's conclusion that appellant's personal financial stake in the outcome was not so disproportionate to the cost of litigation that the lawsuit would not have been brought without the additional incentive of an award of attorney fees. In closing arguments to the jury, appellant's counsel argued that his economic losses ranged from $1.1 to $1.6 million, and suggested an award in the range of $1 to $3 million

for emotional distress damages. He further urged the jury to award punitive damages in the range of $10 to $100 million. His settlement demand at the commencement of trial was $15 million. In the last week of trial, however, he apparently reduced his demand to $3 million. This evidence supports the inference that, at the time important litigation decisions were being made, appellant's expected recovery was always more than enough to warrant incurring the costs of litigation. (See *Beasley* v. *Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459], citing *Los Angeles Police Protective League* v. *City of Los Angeles* (1986) 188 Cal.App.3d 1, 9-10 [232 Cal.Rptr. 697].)

Appellant argues, in reliance upon *Beasley* v. *Wells Fargo Bank, supra*, 235 Cal.App.3d 1407, that the proper measure of his personal stake in the outcome should be the amount the jury actually awarded, and that when measured against the approximately $1.2 million in attorney fees he incurred, the only possible conclusion is that the financial burden was disproportionate to his personal stake in the outcome. The court in *Beasley*, however, specifically affirmed that in assessing the plaintiff's personal stake in the litigation "we do not look at the plaintiff's *actual* recovery after trial, but instead we consider 'the estimated value of the case at the time the vital litigation decisions were being made.'" (*Id.* at p. 1414, quoting *Los Angeles Police Protective League* v. *City of Los Angeles, supra*, 188 Cal.App.3d 1, 9-10.) The reason for the focus on the plaintiff's expected recovery at the time litigation decisions are being made, is that Code of Civil Procedure section 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation. The *Beasley* court nevertheless used the actual recovery as a starting point in the calculation of the "estimated value" of the case, because it found little disparity between the amount actually recovered and the amount the plaintiff expected to recover. (235 Cal.App.3d at p. 1416.) The court cautioned, however, that the distinction between the plaintiffs' expected, and actual recovery as a measure of their stake in the litigation "would normally be important when there is substantial disparity between actual recovery and the amount the plaintiffs 'hoped' to recover." (*Ibid.*)

In this case, the evidence demonstrates a substantial disparity because the jury verdict turned out to be significantly less than the amount appellant sought or expected. It is appropriate in such cases for the trial court to rely on evidence of appellant's realistic expected recovery, rather than the amount actually recovered. ■ Private attorney general fees are not intended to provide insurance for litigants and counsel who misjudge the value

of their case, and vigorously pursue the litigation in the expectation of recovering substantial damages, and then find that the jury's actual verdict is not commensurate with their expenditure of time and resources. Instead, its purpose is to provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate. ▮▮▮ The trial court, having presided over the trial and heard all the evidence and arguments, is in a far better position than this court to assess what the plaintiff's realistic expected recovery was in this case, and we shall defer to its judgment.

Appellant also argues, in reliance upon *Beasley*, that evidence of his preverdict settlement demands and the amounts he asked the jury to award may not be considered as some indication of his expected recovery. The court in *Beasley*, however, merely observed that the initial demands contained in a complaint were not probative of plaintiff's expectations, because such demands are usually very general, and often exceed the plaintiff's realistic expectations. (*Beasley* v. *Wells Fargo Bank, supra*, 235 Cal.App.3d 1407, 1416.) No doubt the amounts appellant asked the jury to award may also have exceeded the amount appellant realistically expected to recover. Yet, unlike an initial demand in a complaint, these demands were made after complete discovery, and substantial litigation, and therefore are relevant measures of appellant's expected recovery in the case. We conclude that the trial court did not abuse its discretion in finding that appellant failed to establish that his personal stake in the outcome was disproportionate to the financial burden of litigation.[1] Even if the court considered only the lowest of these figures, i.e., the final $3 million settlement demand in the last week of trial, appellant's expected recovery was not so disproportionate to the fee incurred that it did not provide sufficient financial incentive to pursue the litigation. It is only *in hindsight*, that incurring approximately $1.2 million in attorney fees turns out to have been disproportionate to appellant's actual recovery.

▮▮▮ Appellant contends that it is an abuse of discretion for the trial court to deny a request for attorney fees based on a finding that he failed to satisfy one of the statutory criteria set forth in Code of Civil Procedure section 1021.5, and that instead the court must make findings as to each factor and

---

[1] Appellant's brief exhaustively discusses numerous cases he contends demonstrate that his request for attorney fees should have been granted. When we are reviewing the exercise of a trial court's discretion, the fact that another court may have exercised its discretion in a different manner does not establish that the exercise of discretion under review was not also within the range of reason.

engage in a balancing test. The cases upon which appellant relies, however, hold only that if the court finds that *all* the criteria are met, the court may balance or weigh them, in making the ultimate determination whether fee shifting is appropriate. (See *Beasley* v. *Wells Fargo, supra,* 235 Cal.App.3d 1407, 1415; *Los Angeles Police Protective League* v. *City of Los Angeles, supra,* 188 Cal.App.3d 1, 6.) In a case such as this, where the court finds that one of the statutory criteria is *not* met, it is unnecessary to make findings concerning the remaining criteria.[2]

In any event, appellant could not have been prejudiced by the fact that the court did not also make findings and weigh the remaining statutory factors, because his showing in support of these factors was even less compelling. For example, he identifies several important public rights his lawsuit sought to enforce: the right of privacy, the right of utility ratepayers not to pay for imprudent practices by PG&E, and protection of "whistleblowers." In some cases, the plaintiff's vindication of the right to privacy involves common societal interests, such as asserting the right to refuse drug testing, *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d 1, 30-31, or preserving the right to seek an abortion by preserving public access, *Planned Parenthood* v. *Aakhus* (1993) 14 Cal.App.4th 162 [17 Cal.Rptr.2d 510]. In this case, however, appellant's invasion of privacy claims were premised upon PG&E's public disclosure of the false statement that he was being investigated for accepting kickbacks, when in fact the investigation concerned other types of misconduct. Thus, the privacy claims were concerned only with vindication of his personal reputation, not any important public right. (See, e.g., *Angelheart* v. *City of Burbank* (1991) 232 Cal.App.3d 460, 469 [285 Cal.Rptr. 463] ["[N]ot all lawsuits enforcing constitutional guarantees will warrant an award of fees."].) No doubt the right of the utility payer not to pay for imprudent practices of PG&E is also important; however, these rights were enforced, and the benefit conferred, by the Utilities Commission's proceeding, not by appellant's lawsuit.[3] Finally, appellant asserted that his lawsuit established the right of whistleblowers

---

[2]Although the trial court is not required, in the exercise of its discretion, to make findings with respect to each factor, the decision to do so obviously minimizes the possibility of a remand because it provides this court with a more complete record and alternative grounds for upholding the court's order.

[3]Although the "necessity" of private enforcement is actually a separate factor from the "financial burden," the trial court did not separately analyze it. To the extent that appellant claims to have enforced an important public right of utility ratepayers by cooperating with the Utilities Commission's investigation that led to the disallowance of recovery of costs attributable to imprudent gas purchasing practices, we fail to see how appellant could demonstrate that private enforcement was necessary. Normally a showing of "necessity" is made when the plaintiff shows that "no public agency was willing or able" to enforce the right established by the plaintiff's lawsuit. (*Beach Colony II* v. *California Coastal Com., supra,* 166 Cal.App.3d

not to suffer retaliation in their employment and thereby conferred a public benefit by encouraging other whistleblowers to report violations of the law by the their employers. He acknowledges that the Legislature deemed it unnecessary to include a right to attorney fees when enacting Labor Code section 1102.5, yet asserts that without the additional incentive of an attorney fees award such suits will not be brought because the plaintiff's actual damages may be too small relative to the resources that must be expended to prove the case, and the potential for recovery of punitive damages is too speculative. The trial court, however, found that in this case appellant's expected recovery *did* provide an adequate incentive and we have found that the record supports that finding.

## CONCLUSION

The order denying appellant's request for attorney fees is affirmed.

Strankman, P. J., and Dossee, J., concurred.

A petition for a rehearing was denied February 26, 1996, and appellant's petition for review by the Supreme Court was denied May 15, 1996. Baxter, J., and Chin, J., did not participate therein.

106, 112.) In this case the Utilities Commission assumed the obligation of investigating PG&E's gas purchasing contracts, and granted relief to ratepayers in a public review process that was entirely independent of appellant's lawsuit.